**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AMY V.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 22 C 00009 |
| | ) | |
| KILOLO KIJAKAZI, Acting Commissioner | ) | Judge Rebecca R. Pallmeyer |
| of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Amy V. appeals the Social Security Administration's denial of her claim for Social Security disability insurance benefits. For the reasons discussed below, the Commissioner's motion for summary judgment is granted, and the court upholds the denial of benefits.

## BACKGROUND

Plaintiff, a forty-year-old woman, filed an application for Social Security disability benefits on October 22, 2019, alleging she was disabled as of January 15, 2019 by a variety of conditions: bipolar disorder, manic depression, multiple personality disorder, attention deficit/hyperactivity disorder ("ADHD"), and attention deficit disorder ("ADD"). (Administrative Record (hereinafter "R") [11] at 56–58.) The Bureau of Disability Determination Services ("DDS") initially denied Plaintiff's claim on June 29, 2020 (R. 62) and again upon reconsideration on September 29, 2020 (R. 71). Plaintiff appealed those decisions (R. 91) and requested a hearing before an administrative law judge ("ALJ"), which was held on April 14, 2021 (R. 29–55).

ALJ Laurie Wardell issued a written decision on June 1, 2021, finding that Plaintiff was not disabled under the Social Security regulations. (R. 10–28.) The ALJ considered a range of

---

[1]    In accordance with this district's Internal Operating Procedure 22, the court refers to Plaintiff only by her first name and the first initial of her last name.

evidence, including Plaintiff's medical records, a consultative examination performed by a state-agency psychologist, and Plaintiff's hearing testimony. (*See* R. 15–22.)

On November 15, 2021, the Social Security Appeals Council declined to review the ALJ's decision (R. 1–6), rendering it final for the purposes of judicial review. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021). Plaintiff filed this action on January 3, 2022 [1] and the Commissioner moved for summary judgment on June 10, 2022 [13].

I. **Documentary Evidence**

A. **Treatment Prior to Benefit Application**

Plaintiff has a history of bipolar disorder; her symptoms include pressured speech, aggressive behavior, paranoid thoughts, impulsivity, and hyperactivity. Beginning at least as early as 2015, she has intermittently sought treatment and intermittently taken medication to manage her mental health symptoms. During a medical appointment in June 2015 for underarm pain (unrelated to Plaintiff's disability benefits application), Dr. Michele Walker noted that Plaintiff had been taking medications including sertraline (Zoloft) and quetiapine (Seroquel).[2] (R. 554–55.) Dr. Walker noted that Plaintiff's aggressive behavior presented a "chronic problem" that was "rapidly worsening" and recommended that Plaintiff obtain a psychological assessment. (R. 555.) The record does not reflect that Plaintiff followed through with this referral. A year later, Katija McCarthy, a nurse practitioner, saw Plaintiff for a hand injury. (R. 564.) McCarthy's notes state that Plaintiff wanted medication refills for sertraline and quetiapine and a referral to a psychiatrist. (*Id.*) McCarthy made a referral to psychiatry, though it appears Plaintiff did not follow up on this

---

[2] Plaintiff's medical records refer at times to the brand name and at other times to the generic name for her various medications. For consistency, this opinion will refer to the relevant medications by their generic names. Sertraline is used to treat several mental health conditions, including depression. *See* https://medlineplus.gov/druginfo/meds/a697048. All websites cited in this opinion were last visited on September 28, 2022. Quetiapine belongs to a class of medications called atypical antipsychotics and is used to treat, among other conditions, bipolar disorder. *See* https://medlineplus.gov/ druginfo/meds/a698019.html.

referral either.  (*Id.*)  A progress note from Access Community Health ("Access") shows Plaintiff was not taking any psychiatric medications in May 2017.  (R. 574.)

On June 13, 2019, Plaintiff made an appointment at Access with family practitioner Dr. Narayan Prabhakar.  (R. 287.)  At the start of the appointment, Plaintiff told Dr. Prabhakar she had a "history of bipolar disorder" but had not been on medication for several years, and Dr. Prabhakar wrote that Plaintiff sought to "get restarted" on bipolar medication due to "bouts of depression."  (*Id.*)  Dr. Prabhakar also noted that Plaintiff seemed "anxious and sad with pressured speech," and he ordered staff to direct her to a psychiatrist for immediate further treatment.  (R. 287, 289.)

Later that same day, Plaintiff attended a counseling session with Norma Jones, a Licensed Clinical Social Worker ("LCSW").  (R. 292.)  Jones noted that Plaintiff's mood during her counseling session was anxious and sad, her affect was constricted, and her leg was bouncing restlessly.  (R. 292–93.)  Jones wrote that Plaintiff's speech was initially pressured but then calmed to normal.  (R. 293.)  Jones also noted that Plaintiff's insight and judgment were "impaired."  (*Id.*)

On August 1, 2019, Plaintiff followed up with Kashara Warren, LCSW.  (R. 316.)  Warren's report states Plaintiff's "appearance [was] appropriate with irritable and guarded demeanor and normal activity."  (*Id.*)  Plaintiff's speech was "within normal limits, goal-directed and tangential."  (*Id.*)  Plaintiff's mood was "irritable and anxious" though she was "oriented to time, place, person and situation."  (*Id.*)  Plaintiff reported excessive worry, irritability, anhedonia, fatigue, sleep disturbance, hopelessness, appetite problems, self-isolation, crying spells, impulsivity, decreased need for sleep, and risky behaviors.  (R. 317.)  Warren also recorded that Plaintiff had "difficulty focusing in treatment."  (*Id.*)

Plaintiff did not return for another therapy session in the coming weeks but, on September 26, 2019, during an appointment for a gastrointestinal condition with Nurse Practitioner Michele Toney, Plaintiff again requested a referral for psychiatric treatment.  (R. 321.)  Toney's notes

reflect that Plaintiff was not taking psychiatric medication at that point (R. 320–21), and that Plaintiff was "alert and oriented to person, place, and time" (R. 322–23).

On November 15, 2019, Plaintiff saw Dr. Sharon Lieteau, a psychiatrist at Access for an "initial evaluation visit." (R. 342.) According to Dr. Lieteau's notes, Plaintiff provided information about her personal background. (*Id*.) She reported that she had been "in a stable relationship" for about one year but was at that point unemployed. (*Id*.) Plaintiff relayed that she had been diagnosed as having ADHD, bipolar disorder, and, since she was five years old, a learning disability. (*Id*.) Dr. Lieteau wrote that Plaintiff reported "impulsivity, insomnia, mood swings with irritability, lack of focus and hyperactivity" and that Plaintiff described herself as violent and unable to control her emotions. (*Id*.) Plaintiff stated she had been hospitalized about six years earlier and had tried to kill herself a "few times" when she was in high school. (*Id*.) She also reported a history of sexual abuse and a family history of bipolar disorder. (*Id*.) According to Dr. Lieteau's notes, Plaintiff mentioned she "would like therapy." (*Id*.) Dr. Lieteau also described Plaintiff as appearing "neatly," her behavior as mildly agitated, her speech as "[c]oherent and goal directed," and her mood and affect as "euthymic."[3] (R. 343.) Dr. Lieteau noted that Plaintiff's insight and judgment were "limited," but Plaintiff had "sequential and goal directed thoughts" and "grossly intact" cognition. (*Id*.) Dr. Lieteau prescribed olanzapine (Zyprexa) and fluoxetine (Prozac).[4] (R. 337.)

Plaintiff had a follow-up appointment with Dr. Lieteau on December 21, 2019, during which Dr. Lieteau noted that Plaintiff reported that "the mood swings and irritability have stopped but

---

[3]     Euthymia is "a normal, tranquil mental state," characterized as "the goal of psychiatric and psychological interventions" in persons with bipolar disorder. *See* https://en.wikipedia.org/ wiki/Euthymia_(medicine).

[4]     Olanzapine is an antipsychotic drug used to treat schizophrenia and bipolar disorder. *See* https://medlineplus.gov/druginfo/meds/a601213.html. Fluoxetine is a selective serotonin reuptake inhibitor (SSRI) that is used to treat several mental health conditions. *See* https://medlineplus.gov/druginfo/meds/a689006.html. It is sometimes prescribed with olanzapine to treat "episodes of depression in people with bipolar disorder." *Id.*

she has persistent insomnia." (R. 356.) Dr. Lieteau noted Plaintiff was "alert and cooperative" and had "mild psychomotor agitation." (R. 357.) The doctor characterized Plaintiff's mood and affect as "euthymic," and again noted she suffered from "impaired insight and judgment" but had "sequential and goal directed thoughts." (*Id.*) Dr. Lieteau discontinued the fluoxetine prescription but added bupropion (Wellbutrin) and trazodone (Desyrel).[5] (R. 352.)

Plaintiff's next record encounter with a health care provider occurred several months later, when she met with a primary care nurse practitioner for a telehealth appointment on May 4, 2020. (R. 398.) During that call, Plaintiff reported she had "been having a really hard time" and had "not been able to concentrate." (R. 403.) Plaintiff said "everything ha[d] been really strange" since she ran out of olanzapine.[6] (*Id.*) She complained of difficulty in refilling her prescriptions for "mood stabilizers" and reported experiencing manic episodes. (*Id.*)

The following day, however, Plaintiff talked to Dr. Lieteau, reporting that she was "doing well" and her "only issue" was that she "gained weight and want[ed] to stop the olanzapine," presumably to replace it with a drug that would produce fewer side effects. (R. 441.) Dr. Lieteau assessed that Plaintiff was "stable" and was experiencing no active symptoms. (*Id.*) The doctor discontinued olanzapine and added aripiprazole (Abilify) to Plaintiff's regimen.[7] (R. 439–40.) Dr. Lieteau also renewed the prescriptions for bupropion and trazodone, and set a follow-up appointment for one month later. (R. 440–41.)

---

[5] Bupropion is used to treat depression and other mental health conditions. *See* https://medlineplus.gov/druginfo/meds/a695033.html. Trazodone is a serotonin modulator used to treat depression. *See* https://medlineplus.gov/druginfo/meds/a681038.html.

[6] The record does not make clear when Plaintiff ran out of olanzapine. Her medical records indicate that on December 21, 2019 Dr. Lieteau intended Plaintiff's prescription to last through May 5, 2020—the day after Plaintiff reported adverse effects from running out. (R. 394.)

[7] Aripiprazole is an atypical antipsychotic used to treat symptoms of many conditions, including episodes of mania and depression. *See* https://medlineplus.gov/druginfo/meds/a603012.html.

### B. Consultative Report with Dr. Patricia Kimbel

The next interaction between Plaintiff and a health care provider that is reflected in the record was a consultative telehealth exam in connection with her benefits application.  (R. 425.)  Plaintiff met with Patricia Kimbel, Psy.D., on June 24, 2020.  (*Id.*)  According to Dr. Kimbel's report, Plaintiff stated she was applying for disability benefits because "it's hard for [her] to keep a job. [She] ha[s] Bipolar and [she] wasn't on proper medications."  (*Id.*)  Plaintiff reported having "episodes" and "frequent mood swings."  (*Id.*)  Plaintiff also reported she had "a lot of anxiety." (*Id.*)

Dr. Kimbel's "mental status examination" states the following.  Plaintiff's motor movement "appeared mildly agitated," as she was rocking back and forth at times.  (R. 426.)  Plaintiff reported dysphoric feelings but her "thought processes were linear, logical, and relevant" and she "denied any psychotic symptoms."  (*Id.*)  As for Plaintiff's memory and concentration, she could "repeat back a four and five digit sequence but not a five digit sequence in digit span forward," and could repeat "a three and four digit sequence but not a five digit sequence in digit span backward."[8]  (R. 426–27.)  Plaintiff was "able to complete simple calculations of addition and multiplication" but "was unable to subtract continuous sevens from 100 or continuous threes from 20."  (R. 427.)  Dr. Kimbel observed that Plaintiff had "fair to good judgment and insight."  (*Id.*)

### C. First State-Agency Medical Opinion

The state agency enlisted Lionel Hudspeth, Psy.D., to opine on Plaintiff's ability to work. After reviewing Plaintiff's medical records from June 2019 to June 2020 (but not examining her), Dr. Hudspeth concluded that Plaintiff's impairments were "not severe" and did not significantly limit her physical or mental ability to carry out basic work activities.  (R. 60–62.)

---

[8]     Medical professionals use digit span tests to assess an individual's short-term memory.  Here, after Dr. Kimbel told Plaintiff five digits in a row, Plaintiff was unable to recite those digits back in reverse order.  *See* David L. Woods, et. al, *Improving digit span assessment of short-term verbal memory*, 33 J. Clin. Exp. Neuropsychol. 101–11 (2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2978794/.

### D.    Treatment from July 2020 to September 2020

Plaintiff followed up with her psychiatrist by telephone on July 2, 2020.  (R. 447.)  According to Dr. Lieteau's notes, Plaintiff reported sadness and poor concentration.  (*Id.*)  At Plaintiff's request, Dr. Lieteau changed her medication regimen, dropping aripiprazole and instead prescribing lurasidone (Latuda).[9]  (R. 447–48.)  Notes from an appointment five days later, however, show that Dr. Lieteau again prescribed aripiprazole, this time in a higher dose, because ziprasidone (Geodon), a medication she had been taking in lieu of aripiprazole, caused unpleasant side effects.[10]  (R. 453.)  The record does not account for Dr. Lieteau's initial prescription of ziprasidone.

On July 14, 2020, Plaintiff again checked in with Dr. Lieteau, reporting that, since she had started on the higher dosage of aripiprazole, her mood swings had diminished, and she was no longer irritable or argumentative.  (R. 459.)  According to the doctor's notes, Plaintiff's "only complaint" at that point was that she had trouble sleeping, and she otherwise "had no real problems or issues she wanted to discuss."  (*Id.*)  Dr. Lieteau took note of Plaintiff's "sequential and goal directed thoughts" along with "improving insight and judgment."  (R. 460.)  The doctor directed Plaintiff to continue with aripiprazole, increased her trazodone dosage, and instructed Plaintiff to return in two weeks.

Plaintiff next met with Dr. Lieteau over the phone on July 28, 2020.  (R. 466.)  According to the doctor's report from that meeting, Plaintiff again "state[d] that she had no mood swings or irritability" and this time "denie[d] side effects."  (*Id.*)  Plaintiff was reportedly anxious and "looking for a job."  (*Id.*)  Dr. Lieteau noted that Plaintiff had "improving insight and judgment and no

---

[9]      Lurasidone is an atypical antipsychotic with several uses, one of which is to treat depression in adults with bipolar disorder.  *See* https://medlineplus.gov/druginfo/meds/a611016.html.

[10]      Ziprasidone belongs to a class of medications called "atypical antipsychotics" and is used to treat symptoms of several conditions, including bipolar disorder.  *See* https://medlineplus.gov/druginfo/meds/a699062.html.

apparent cognitive deficit." (R. 467.) The appointment notes make no mention of difficulties with concentration. The doctor added a prescription for hydroxyzine (Atarax) to help with Plaintiff's anxiety symptoms.[11] (*Id.*)

On August 7, 2020, Plaintiff contacted Dr. Lieteau seeking a referral for therapy, and then met by phone three days later with William Saracco, LCSW. (R. 472, 691.) According to Saracco's notes, Plaintiff stated that she was "stressed out" over a job loss and job search; she engaged in "catastrophic thinking, worries and paces frequently, sleeps excessively, and has limited social contact by choice." (R. 690–91.) Saracco noted that Plaintiff reported "irritability and feeling bad about herself due to not being able to find employment" along with "excessive goal driven thinking." (R. 692.) By the time of her next appointment with Saracco, however, one week later, Plaintiff reportedly stated she "fe[lt] a bit better and ha[d] established a routine wherein she set[ ] aside specific time for tasks each day." (R. 697.) Saracco noted that Plaintiff was concerned over finances and had been devoting four hours per day to her job search. (R. 697–98.)

Plaintiff met with Saracco over the phone for a functional assessment on August 31, 2020. (R. 703.) Plaintiff told Saracco that she experienced short-term memory problems. (*Id.*) Saracco assessed Plaintiff's stress level as "moderate due to continued unemployment." (R. 705.) He also noted that her functionality had not changed over the past six months, that her mood and affect remained euthymic, and that her demeanor was cooperative and focused. (R. 703.)

In her next phone appointment with Saracco, on September 11, 2020, Plaintiff reported that she managed depressive symptoms by applying for jobs and volunteer opportunities, pursuing public benefits, and shopping. (R. 710.) Saracco noted Plaintiff's demeanor remained calm and cooperative and, though her mood appeared anxious, her speech was normal,. (R. 711.) Saracco's report also does not mention any difficulties with concentration.

---

[11] Hydroxyzine is an antihistamine that can be used to relieve anxiety and tension. *See* https://medlineplus.gov/druginfo/meds/a682866.html.

### E.     Medical Opinion on Reconsideration

On September 25, 2020, Tyrone Hollerauer, Psy.D., a state-agency psychologist, issued an opinion in connection with Plaintiff's application for reconsideration of her disability benefits claim. (R. 68.) After reviewing records from Plaintiff's June 24, 2020 examination by Dr. Kimbel, as well as other medical records (including records from appointments that post-date the state agency's June 26, 2020 opinion),[12] Dr. Hollerauer concluded that Plaintiff's limitations were mild and her impairments non-severe. (R. 69–70.) Dr. Hollerauer's opinion relied exclusively on medical records; he did not examine Plaintiff.

### F.     Recent Follow-Ups with Dr. Lieteau

Plaintiff has continued treatment with Dr. Lieteau, with mixed results. (R. 900.) Notes of a December 23, 2020 appointment show that Plaintiff reported problems with focus and had poor concentration. (R. 901.) She also reported symptoms of depression, anhedonia, sadness, self-deprecating thoughts, and fatigue. (*Id.*) The doctor noted Plaintiff's self-report that "she is not able to accomplish anything because she goes from one thing to the other without finishing." (*Id.*) Dr. Lieteau also noted decreased concentration, dysphoric mood, sleep disturbance, and nervous/anxious behavior, and that Plaintiff demonstrated "fair insight but impaired judgment." (R. 902.) The doctor increased Plaintiff's daily aripiprazole dose and added mirtazapine (Remeron) to help with Plaintiff's troubled sleep.[13] (*Id.*)

A week later, Plaintiff reported feeling "about the same" but said she had "no issues that she wanted to talk about" apart from "trouble concentrating and being distracted from her tasks at work." (R. 908.) Among other observations, Dr. Lieteau noted that Plaintiff showed decreased

---

[12]     Plaintiff asserts that "[n]o new medical evidence was relied on from the previous non-examining opinion," but the report does seem to at least acknowledge record evidence from September 2020. (*See* Pl.'s Br. at 5; R. 65, 69.)

[13]     Mirtazapine is an anti-depressant. *See* https://medlineplus.gov/druginfo/meds/a697009.html.

9

concentration, dysphoric mood, and nervousness. (*Id.*) The doctor decreased Plaintiff's mirtazapine dosage due to "excessive sedation." (R. 909.)

At Plaintiff's next appointment, on January 6, 2021, Dr. Lieteau recorded that Plaintiff reported "feeling better" with "less intense mood swings" and that she had "no issues that she want[ed] to discuss." (R. 921.) Dr. Lieteau noted at this point that Plaintiff was compliant with her medications and denied side effects, and that Plaintiff's mood and disposition were improving. (R. 921–22.) According to the doctor, Plaintiff showed no signs of "agitation, behavioral problems, confusion, decreased concentration, hallucinations, self-injury, sleep disturbance [or] suicidal ideas." (R. 922.) Dr. Lieteau observed that Plaintiff demonstrated "sequential and goal directed thoughts" and had only "mildly impaired concentration." (*Id.*) Plaintiff's insight and judgment had improved, and she lacked any apparent cognitive deficit. (*Id.*) The doctor did not change Plaintiff's medication regimen. (*Id.*)

The next and final appointment accounted for in the record occurred on April 28, 2021. (R. 924.) Dr. Lieteau's report states that Plaintiff had increased stressors: she had "left her job, [had] financial stress and [was] not getting along with her boyfriend." (R. 928.) Plaintiff reported feeling "shut down and sad" and said she had been having two to three panic attacks per week. (*Id.*) Dr. Lieteau noted that, as compared to her last appointment, Plaintiff reported poorer concentration, a more dysphoric mood, and greater sleep disturbance. (*Id.*) The doctor also noted that Plaintiff was in "mild psychological distress" but that her speech was "coherent and goal directed," and that Plaintiff exhibited "improving insight and judgment" and "no apparent cognitive deficit." (R. 929.) Dr. Lieteau reordered hydroxyzine to treat Plaintiff's anxiety symptoms. (R. 927.)

## II.    Administrative Hearing

### A.    Plaintiff's Testimony

Plaintiff and her counsel appeared at a telephone hearing with the ALJ on April 14, 2021. At that hearing, Plaintiff testified that she had trouble keeping a job and was not sure if she could

work 40 hours per week due to her mood swings and panic attacks. (R. 36.) She stated she "can't perform" and "can't work" without medication. (R. 39.) Plaintiff had been taking her medication every day for the three months leading up to the hearing, missing a dose on occasion. (R. 40.) Although she had experienced difficulties with previous medications, Plaintiff reported that her new medications did not cause weight gain or as much fatigue. (R. 41.) Plaintiff stated she was not in talk therapy, and, when asked why not, claimed she "didn't know [it] existed"; the ALJ noted, however, that record evidence shows she had attended therapy sessions in August and September 2020. (*See* R. 18, 40.)

Regarding her daily life, Plaintiff attested that she spent most of her time with her boyfriend and her parents. (R. 41.) At the time of the hearing, she was seeing her boyfriend a couple of times per week. (*Id.*) Her mother, who is retired, had been diagnosed with cancer a few years earlier, but provided care for Plaintiff's father, who suffers from dementia and Parkinson's disease, by taking him to medical appointments and managing his medications. (R. 42, 51.) Plaintiff said she assisted in caring for her father by giving him a catheter, changing his diaper, laundering his bed linens, and sometimes reheating food. (R. 42.) Plaintiff said she is able to dress and bathe herself, go grocery shopping, cook pasta or rice from a box, mow the lawn, and do laundry. (R. 43, 50.) She has trouble sleeping, and self-medicates for this problem with marijuana from a dispensary. (R. 44.) She also described difficulties with moods, including "manic episodes" in which she "get[s] really fast at times, and then a lot of times [she is] really, really slow at things." (*Id.*) Plaintiff reported that upon feeling overwhelmed she shakes, cries, or has a panic attack, which happens two to three times per week. (R. 48–49.)

With respect to her work history, Plaintiff explained that from October 2020 until a few weeks before the April 2021 hearing, she had worked at a kennel for 16 hours per week. (R. 35.) In 2018, she worked as a security guard, and before that she had worked as a gas station attendant. (R. 36–37.) For a few months in 2010 and 2011, Plaintiff worked as a secretary. (R. 37.) She was not engaged in any volunteer or paid work at the time of the hearing. (R. 45.)

Under questioning from her attorney, Plaintiff stated that her short-term memory was "not good because of all the medications [she has] taken." (R. 47.) When asked how well she stays on task, Plaintiff stated that her focus and concentration are "not that great." (*Id.*) When asked how she responds to instruction on new skills, Plaintiff stated that she asks the person teaching her "to show [her] a couple of times, and then [she] can try and figure it out." (*Id.*) When asked about whether she abandons tasks, Plaintiff explained, "I do start stuff that I don't finish, it's a bad thing I have. But I try to stay on task but sometimes it's just a little hard for me." (R. 48.) When asked by counsel to express in her own words why she thought it would be too difficult to work full time, Plaintiff said "[j]ust because I would forget, or I would have trouble like remembering to do what they're asking me to do. I'd have to ask them to show me again." (*Id.*)

## B. Vocational Expert

Dennis Gustafson appeared as a vocational expert ("VE") at the hearing. (R. 52.) Gustafson noted Plaintiff's prior work as a security guard (a semiskilled position that, as performed, required light exertion) and as a general clerk (a semiskilled position, sedentary as performed). (*Id.*) The ALJ provided Gustafson with the following hypothetical: "an individual the same age, education, and work history as the claimant, no exertional level, but [able to accomplish] simple, routine, repetitive tasks, simple work-related decisions, occasional changes, no production rate pace, no hourly quotas, but can do end of day goals." (*Id.*) Gustafson averred that Plaintiff's past work did not meet those limitations but that other jobs did meet those limitations and were available in the national economy. (R. 52–53.) As representative positions, Gustafson identified "marker" (the parties did not otherwise explain this term), housekeeping cleaner, and hospital cleaner. (R. 53.) Gustafson also testified that those jobs would likely be available to a person who "needed to take a break of one or two minutes at the workstation, every hour to refocus." (*Id.*) A person who "needed to be off task over 15 percent" of the time would not be able to carry out those potential jobs, however, and a person absent from work more than two days per month would also be incapable of performing those jobs. (R. 54.)

### III.   ALJ Opinion

### A.   Overview

In her June 1, 2021 decision, the ALJ found Plaintiff "not disabled" following a five-step sequential evaluation, as required by the pertinent regulations.   (R. 10.)   *See* 20 C.F.R. §§ 404.1520, 416.920.   Under those regulations, at step one, the ALJ determines whether the claimant has engaged in substantial gainful activity during the relevant time period.   *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).   At step two, the ALJ determines whether the applicant has a "severe" impairment, i.e., one that significantly limits her physical or mental ability to do basic work activities.   20 C.F.R. §§ 404.1520(c), 416.920(c).   At step three, the ALJ evaluates whether the claimant's impairments or a combination thereof meet or medically equal an impairment listed in the pertinent regulations.   20 C.F.R. Part 404, Subpart P, Appx. 1. If a claimant meets a listing, he or she is presumed disabled and the inquiry stops.   42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1520, 416.920.   If the claimant is not presumptively disabled, before proceeding to step four, the ALJ must determine the claimant's residual functional capacity ("RFC").   *See* 20 C.F.R. §§ 404.1545(a)(1), 404.1520(e), 416.945(a)(1), 416.920(e).   At step four, the ALJ determines whether the claimant can perform past relevant work.   20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at step five, the ALJ determines whether, considering the individual's RFC, age, education, and work experience, the claimant can perform alternative employment which exists in significant numbers in the national economy.   20 C.F.R. §§ 404.1520(f), 416.920(f).   An applicant who cannot perform any other work is considered disabled and entitled to disability benefits.   20 C.F.R. §§ 404.1520(g), 416.920(g).

In this case, the ALJ first found Plaintiff had not engaged in substantial gainful activity after the application date of October 22, 2019.   (R. 15.)   Second, she found Plaintiff's bipolar disorder was a severe impairment.   (*Id.*)   Third, she found Plaintiff did not meet or equal any listings.   (*Id.*) The ALJ then determined Plaintiff had the RFC for

a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to simple, routine, and repetitive work tasks and can make simple work-related decisions in an environment with occasional changes. She can have no production rate pace or hourly quotas, but can meet end of day goals. She needs a one to two minute break every hour at her workstation to refocus.

(R. 17.)

At step four, the ALJ found that Plaintiff was unable to perform past relevant work as a security guard or general clerk. (R. 22.) However, at step five, she found that Plaintiff could perform jobs that exist in significant numbers in the national economy, including housekeeping cleaner or hospital cleaner. (R. 23.) As a result, the ALJ concluded that Plaintiff was not disabled. (R. 24.)

### B. RFC Determination

In this case, the parties dispute the soundness of the ALJ's RFC determination. The ALJ stated she used a two-step process for determining Plaintiff's RFC. (R. 18.) First, she considered whether Plaintiff had an underlying medical impairment. (R. 17.) Second, she evaluated the intensity, persistence, and limiting effects of Plaintiff's related symptoms to determine the extent to which they inhibited Plaintiff's work-related activities. When symptoms were not substantiated by objective medical evidence, the ALJ considered other record evidence to determine how the symptoms bore on work-related activities.

The ALJ noted that Plaintiff initially alleged she was unable to work due to bipolar disorder, multiple personality disorder, and ADHD. (R. 18.) The ALJ also noted that, according to two "function reports" (agency requests for more information) dated January 6 and September 10, 2020, Plaintiff alleged far-reaching effects of her mental health impairments, including limitations in her physical abilities. Specifically, she alleged that her impairments affected her abilities "to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and get along with others." (R. 18, 215–223, 234–45.) The ALJ accurately summarized Plaintiff's hearing testimony, and then concluded that Plaintiff's

14

"statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 18.)

To support this conclusion, the ALJ first noted evidence that Plaintiff "experienced substantial improvement in her symptoms with the appropriate medication." (R. 19.) The ALJ cited record evidence that shows Plaintiff "reported fewer or no mood swings, decreased irritability, and improved mood" along with "no side effects" when she was on the correct medications. (*Id*.) The ALJ pointed out that Dr. Lieteau's notes and Plaintiff's hearing testimony both reflected improvements. (*Id*.) The ALJ then summarized Plaintiff's psychiatric treatment history with a level of detail comparable to this court's own review of the record evidence as set forth above. (R. 19–21.)

The ALJ also remarked on medical opinions and prior administrative medical findings. (R. 21–22.) First, she noted that the record was devoid of any medical source statement from Dr. Lieteau; Plaintiff's counsel, apparently by mistake, had submitted a medical source statement for an entirely different claimant. (*Id*.) Next, the ALJ wrote that she did not find persuasive the opinions of the state-agency psychologists that claimant's bipolar disorder caused no more than mild limitations and was non-severe. (R. 22.) Those opinions, the ALJ pointed out, were not entirely consistent with the reports of Plaintiff's psychiatrist, therapists, and Dr. Kimbel, which tended to show that Plaintiff "experienced some concentration and focus issues and had some short-term memory deficiencies even when on medication." (*Id*.)

To determine Plaintiff's RFC, the ALJ also considered Plaintiff's daily activities in accordance with her testimony at the hearing and her statements to Dr. Kimbel during her consultative exam. (*Id*.) For example, the ALJ accounted for the daily tasks Plaintiff undertakes to care for her father and the statements she made to health care providers regarding her job search. (*Id*.) While the ALJ "d[id] not consider these activities to be conclusive evidence that the claimant could perform full-time work," she concluded "they demonstrate that the claimant is not nearly as limited as alleged." (*Id*.) The ALJ said she also came to this conclusion based on

"treatment notes and mental status exams showing the claimant's symptoms were decreased and stable while she was on medication." (*Id*.) The record as a whole, the ALJ noted in closing, does not support "[a]ny further restrictions." (*Id*.)

## DISCUSSION

A reviewing court affirms the ALJ's decision unless the findings are not supported by "substantial evidence" or the decision has resulted from an error of law. *Mandrell v. Kijakazi*, 25 F.4th 514, 515 (7th Cir. 2022) (citing *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019) and *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012)). The court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment" for that of the agency. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (alteration omitted) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)).

The court must determine whether the agency has followed an "accurate and logical bridge" between the evidence and the conclusion. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001)). This bridge enables the court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). An ALJ's failure to build this bridge is subject to harmless error review. *See Jozefyk v. Berryhill*, 923 F.3d 492, 495 (7th Cir. 2019) (per curiam).

## I. Support for the ALJ's RFC Determination

Plaintiff contends that the ALJ failed to properly evaluate evidence concerning Plaintiff's bipolar disorder, leading the ALJ to determine Plaintiff's RFC based upon the ALJ's own lay judgment rather than a doctor's expert opinion. A claimant's RFC is the most a claimant can do despite her limitations, 20 C.F.R. § 404.1545(a)(1), and is determined "based on all the claimant's impairments and all the relevant evidence in the record." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009). The Seventh Circuit will uphold an ALJ's RFC determination so long as it adequately accounts for a claimant's "demonstrated psychological symptoms." *Jozefyk*, 923 F.3d at 498.

16

Although the RFC is a legal determination ultimately reserved for the Commissioner, "courts have stressed the importance of medical opinions to support a claimant's RFC." *Merri R. v. Kijakazi*, No. 2:21-CV-298, 2022 WL 1055616, at *12 (N.D. Ind. Apr. 6, 2022) (collecting cases in which the Seventh Circuit has stated an ALJ may not "play[ ] doctor"). As a general principle, "ALJs should not attempt to analyze the significance of medical findings without input from an expert." *Gibbons v. Saul*, 801 F. App'x 411, 417 (7th Cir. 2020). Consequently, the ALJ's RFC assessment should not rest on "her own lay opinions" that could "fill evidentiary gaps in the record." *Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010). When an ALJ rejects every expert opinion of record and substitutes her own judgment, a remand for further proceedings may be necessary. *See, e.g.*, *Robert H. v. Saul*, No. 19-CV-50114, 2021 WL 2894161, at *4 (N.D. Ill. July 9, 2021) (remanding upon finding that ALJ played doctor by crafting RFC after no medical expert testified at the hearing and the ALJ rejected the opinions of state agency doctors).

Plaintiff attempts to draw a comparison between this case and others where courts have found reversible error as a result of an ALJ's impermissible gap-filling. For example, Plaintiff cites to *Anthony S. v. Saul*, No. 18-CV-50220, 2020 WL 30601, at *2 (N.D. Ill. Jan. 2, 2020), in which the ALJ issued an unfavorable decision to a claimant who was diagnosed with bipolar disorder, among other conditions. In *Anthony S.*, the ALJ discredited the claimant's treating psychologist's opinion that the claimant "had marked limitations" and "would likely be absent from work four or more days a month." *Id.* at *1. Concerned that "the ALJ's analysis necessarily was based on her layperson judgments," the *Anthony S.* court noted the Seventh Circuit's recognition that "the temptation to play doctor is particularly acute where, as here, the claimant has psychological impairments." *Id.* at *2 (collecting Seventh Circuit cases). Notably, the ALJ in *Anthony S.*, and in the other opinions cited by Plaintiff here, rejected a medical opinion *favorable* to the claimant. *See, e.g.*, *Cory W. v. Kijakazi*, No. 22-CV-6610-DLP-JPH, 2022 WL 819148, at *10 (S.D. Ind. Mar. 18, 2022) (remanding when ALJ rejected all medical opinions to find fewer physical limitations than noted by the medical experts).

17

In this case, the ALJ's analysis did not discount medical opinions that confirmed limitations. To the contrary, here the ALJ reviewed the only medical opinions of record—the state-agency psychologists' opinions that Plaintiff suffered no severe impairments—and found them unpersuasive.[14] The ALJ's RFC determination, if flawed at all, did not prejudice Plaintiff: it gave greater credence to Plaintiff's self-reported symptoms than the state-agency doctors did. For example, the ALJ determined in Plaintiff's RFC limitation that she "needs a one to two minute break every hour at her workstation to refocus." This court found no medical evidence (no any statement of Plaintiff herself) that she needs a brief break every hour. To the extent the ALJ created any evidentiary gap, she filled it to Plaintiff's benefit. Plaintiff is not entitled to a remand for this reason.

## II.     The ALJ's Error Was Harmless

In urging that the ALJ's RFC determination was flawed, requiring remand, Plaintiff ignores the principle that the court will not remand a decision if it is clear that the ultimate result on remand would not change. *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013) (per curiam). Plaintiff must demonstrate that any purported error harmed her, *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009), and appears to believe she has done so merely by noting that the ALJ ultimately denied her claim for benefits (Pl.'s Br. at 12–13). As Plaintiff sees things, the ALJ provided an improper RFC as a hypothetical to the VE, the VE identified available jobs in response, and the ALJ then relied on the VE's testimony to find Plaintiff was not disabled. (*Id.*) But as the Commissioner points out, Plaintiff has not identified any specific limitations supported by the record that the ALJ omitted. (Def.'s Br. at 5.) Plaintiff declined to respond to this contention. (Pl.'s Reply Br. [15] at 1 ("Plaintiff deems no reply necessary because any reply would simply duplicate arguments made

---

14    Plaintiff argues that, even if the ALJ had relied on the state agency opinions, these examining opinions only assessed portions of the record, so such reliance was improper. (Pl.'s Br. at 11–12.) Because the ALJ made expressly clear that she found those opinions "unpersuasive" and thus did not rely on them at all, the court need not address the parties' arguments about the hypothetical situation in which the ALJ gave them any weight. (*See* R. 22.)

in the original brief, and accordingly relies on the original arguments and authority contained in her primary brief.”))

The court agrees with the Commissioner that remand is unnecessary here because Plaintiff has proffered no evidence that she has greater limitations than those set forth by the ALJ. On this point, *Gedatus v. Saul*, 994 F.3d 893, 895 (7th Cir. 2021) is instructive.  In *Gedatus*, the Seventh Circuit affirmed the ALJ's RFC assessment in part because the claimant "did not offer any opinion from her doctors that her [condition] disabled her."  *Id*. at 902–03.  Gedatus alleged she had difficulty sitting, but the ALJ did not incorporate this alleged limitation into her RFC.  *Id*. at 903*.*  The reviewing court noted a "fundamental problem" with the plaintiff's argument: "she offered no opinion from any doctor to set sitting limits, or any other limits, greater than those the ALJ set."  *Id*. at 904.  The same is true here, where this ALJ also "assessed *more* limits than any doctor did."  *Id*. (emphasis in original).  District courts in this circuit also have found no reversible error when presented with plaintiffs' "quizzical" contentions that "the ALJ erred by placing more— not fewer—restrictions on Plaintiff's RFC" than any doctor of record.  *Karla J.B. v. Saul*, No. 19-CV-50019, 2020 WL 3050220, at *4 (N.D. Ill. June 8, 2020); *see also Anthony L. v. Kijakazi*, No. 20-CV-5184, 2022 WL 2237141, at *4 (N.D. Ill. June 22, 2022); *Patrick C. v. Saul*, No. 20-CV-608, 2020 WL 6287370, at *8 (N.D. Ill. Oct. 27, 2020).

Plaintiff's request for remand is further undermined by her failure to identify any particular work restriction.  In *Jozefyk*, 923 F.3d at 497, the Seventh Circuit clarified that a plaintiff cannot show harm worthy of remand without articulating what additional work restriction the record supports but the ALJ declined to consider.  As is also true here, in *Jozefyk* it was "unclear what kinds of work restrictions might address [the claimant's] limitations in concentration, persistence, or pace because [she] hypothesizes none."  *Id.*  Like Jozefyk, Plaintiff "cites no evidence that [her] deficits keep [her] from performing simple, routine, and repetitive tasks."  *Id.*  It is clear from the record that Plaintiff suffers from mental impairments, but her failure to bring forward medical evidence of how those impairments bear on work-related limitations distinguishes her case from

those she cites for support.[15]  *See Anthony S.*, 2020 WL 30601, at *1 (noting plaintiff's diagnosing doctor "completed a mental RFC questionnaire" opining about plaintiff's "marked limitations" and the likelihood that he would "be absent from work four or more days a month"); *Robert H.*, 2021 WL 2894161, at *6 (finding "ample record evidence" that plaintiff's fibromyalgia would prevent his ability to perform lifting and carrying requirements of his RFC).  As a result, even assuming the ALJ erred by failing to provide a well-reasoned explanation for the limitations she assessed, remand would be unwarranted because record evidence compels no limitation greater than those the ALJ set forth.

The court is unpersuaded by Plaintiff's effort to fault the ALJ for not seeking an additional medical expert opinion after rejecting the state-agency doctors' opinions.  Plaintiff cites to *Heather K.R. v. Comm'r of Soc. Sec.*, No. 3:20-CV-00538-MAB, 2022 WL 815108, at *10 (S.D. Ill. Mar. 17, 2022) as a point of comparison.  The only medical opinions of record in that case were from state-agency doctors who did not know of or consider the claimant's later lupus diagnosis, and the ALJ assessed limitations of the claimant's lupus diagnosis on her own.  *Id.* At *10.  *Heather K.R.* is not analogous to this case, where Plaintiff's diagnosis and alleged symptoms did not materially change after the state-agency doctors reviewed her file.  Plaintiff cites to record evidence that, after the state-agency doctors issued their opinions, she reported poor concentration, sadness, sleep difficulties, and anxiety to her therapist and psychiatrist.  (Pl.'s Br. 11–12.)  But those same symptoms are also listed in both of the state-agency doctors' opinions. (R. 60 (observing that "claimant had trouble stay[ing] focused" and noting her reports of "difficulty sleeping" and "irritable and anxious" mood); R. 68 (noting, among other symptoms, Plaintiff's reports of "[d]ecreased concentration, dysphoric mood, sleep disturbance")).)  The ALJ did not

---

[15]     Plaintiff's brief argues that the ALJ failed to account for how her symptoms "waxed and waned" but does not explicate how the episodic nature of her symptoms relate to any particular work-related function.  (Pl.'s Br. at 10.)  Plaintiff does not rebut the ALJ's finding that Plaintiff's symptoms were greatly improved when she was on proper medication, and Plaintiff admits that the record shows her insight and judgment "did improve some" over time.  (*See id.*)

need to call in a new expert to opine on those long-standing symptoms. *See Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021) (noting the relevant issue is "whether new information changed the picture so much" that it would be error to rely on an outdated assessment or "whether the updated information was minor enough that the ALJ did not need to seek a second opinion" (citation omitted)). Because Plaintiff's condition did not materially worsen after the state-agency doctors reviewed her case, there is no basis for concluding that an additional medical expert's opinion would yield a different result.

Notably, Plaintiff has been represented by counsel at her administrative hearing and before this court. While ALJs bear "some responsibility for developing the administrative record, they are also free to assume that a claimant represented by counsel has presented her strongest case for benefits." *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 679 (7th Cir. 2010) (internal citations omitted); *see also Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017) (stating that a represented claimant is "presumed to have made her best case before the ALJ"). During the administrative proceeding, Plaintiff's counsel neither introduced a medical opinion rebutting those of the state-agency doctors nor asked the ALJ to seek an additional opinion. Presented with a comparable situation, the Seventh Circuit stated it was appropriate to infer that Plaintiff "decided another expert opinion would not help her." *Buckhanon ex. Rel. J.H.*, 368 F. App'x at 679. Because the court assumes Plaintiff made her strongest case to the ALJ, it also finds unpersuasive Plaintiff's contention that the ALJ erred by relying on Dr. Lieteau's treatment notes. Plaintiff faults the ALJ for relying on notes from phone visits that she views as "inherently less helpful" than an opinion by examining physician—but Plaintiff did not provide such an opinion. (Pl.'s Br. at 12 (citing *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (emphasizing importance of a doctor's "opportunity to physically examine" a claimant).) Because Plaintiff has made no showing to the contrary, the court is comfortable concluding that the outcome would not change even if the ALJ were to call back a testifying medical expert. Remand is therefore unwarranted in this case.

## **CONCLUSION**

For the reasons set forth above, the court grants the Commissioner's motion for summary judgment [13] and upholds the denial of benefits. The Clerk is directed to enter judgment in favor of the Commissioner. Civil case terminated.

ENTER:

Dated: November 18, 2022

_____
REBECCA R. PALLMEYER
United States District Judge